**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

**MARTHA L. CAIN,**

       **Plaintiff,**

**v.**                                      **Civil Action No.: 5:10-CV-33**
                                                      **JUDGE STAMP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING**
**THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT [11], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8],**
**AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.  INTRODUCTION

On March 18, 2010, Plaintiff Martha L. Cain ("Plaintiff"), by counsel Louis H. Khourey,

Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant

Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant

to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF

No. 1)  On May 27, 2010, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant

United States Attorney, filed an answer and the administrative record of the proceedings. (Answer,

ECF No. 5; Administrative Record, ECF No. 6)  On June 22, 2010, and August 20, 2010, Plaintiff

and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Motion, ECF

No. 8; Def.'s Motion, ECF No. 11)  Following review of the motions by the parties and the transcript of the administrative proceedings, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. BACKGROUND

A.    Procedural History

On August 30, 2006, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning January 31, 2006. (R. at 121-25) Plaintiff's claim was initially denied on March 12, 2007, and denied again upon reconsideration on July 2, 2007. (R. at 79, 86-88)  On July 26, 2007, Plaintiff filed a written request for a hearing, which was held before a United States Administrative Law Judge ("ALJ") on November 20, 2008, in Wheeling, West Virginia. (R. at 27-76, 93-116)  On April 16, 2009, the ALJ issued an unfavorable decision to Plaintiff, finding that she has not been under a disability within the meaning of the Social Security Act.  (R. at 12-26)  On February 3, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-5)  Plaintiff now requests judicial review of the ALJ decision denying her application for disability.

B.    Personal History

Plaintiff Martha L. Cain was born March 2, 1959, and was 47 years old at the time she initially applied for disability insurance benefits.. (R. at 23, 121, 141)  Plaintiff is a high school graduate, has completed a licensed practical nurse program, and is currently employed as an

insurance clerk at Reynolds Memorial Hospital in Glen Dale, West Virginia. (R. at 38-39, 70) Plaintiff is married, has two sons, and one grandchild. (R. at 36, 61)

C.    Medical History

Plaintiff was admitted to Wheeling Hospital on February 1, 2006, with complaints of numbness and intermittent discoloration in her feet. (R. at 443) She was hospitalized at Wheeling Hospital from February 1, 2006, to February 21, 2006, and was diagnosed with thoracic aortic thrombosis and embolism suspected secondary to remnant ductus arteriosus, bilateral lower extremity emboli, diabetes mellitus, diabetic neuropathy, acute vascular insufficiency feet and toes secondary to embolism, and hypertension. (R. at 443) During her stay at Wheeling Hospital, Plaintiff had significant difficulties with circulation in her feet and hands, severe foot and leg pain, and necrosis of some of the distal toes. (R. at 443-444) On February 21, 2006, she was transferred to the Skilled Care Unit of Reynolds Memorial Hospital for physical therapy and continued pain control. (R. at 280, 444)

Plaintiff was hospitalized at Reynolds Memorial Hospital from February 21, 2006, to March 9, 2006, and was diagnosed with emboli to the toes with gangrene, ischemic pain, Type II diabetes, gastroesophageal reflux disease, digital ischemia, anemia, thrombocytosis, and leukocytosis. (R. at 280) Plaintiff initially suffered from ischemic pain that was treated with a Duragesic patch and Dilaudid, as well as Percocet. (R. at 280) However, during her hospitalization, Plaintiff's pain slowly improved, and upon discharge her pain was well-controlled, requiring only intermittent Percocet and continuance of the Duragesic patch. (R. at 280)

On March 29, 2006, Plaintiff consented to surgery on her feet. (R. at 339-41) Also on March 29, 2006, Plaintiff's feet were X-Rayed, revealing small bilateral calcaneal spurs and abnormality of the soft tissues, particularly overlying the distal first toe. (R. at 193) On April 3, 2006, an MRI was performed on her right lower extremity, showing osteomyelitis of the first through third digits of the right foot. (R. at 192) A noninvasive arterial study performed on April 6, 2006, showed mild arterial insufficiency in the right lower extremity. (R. at 210)

On April 7, 2006, Melissa Gaffney, D.P.M, performed a partial first ray amputation of the right foot, partial right second toe amputation, and partial left hallux amputation on Plaintiff at East Ohio Regional Hospital. (R. at 194-95) Plaintiff's post-operative diagnosis was gangrene with osteomyelitis of the right first and second toe, and gangrene in the left hallux. (R. at 194) Additionally, she developed a small hematoma of the right amputation site. (R. at 196) Upon discharge, Plaintiff continued use of the Duragesic patch and Percocet for pain. (R. at 196)

Plaintiff was transferred to Reynolds Memorial Hospital on April 12, 2006, with a diagnosis of gangrene and osteomyelitis. (R. at 258) She received physical therapy, and was given anticoagulants, antibiotics, and pain medication. (R. at 258) During this period, Plaintiff's pain decreased, she participated in physical and occupational therapy, and was hemodynamically stable. (R. at 258) On April 18, 2006, Plaintiff informed Dr. Gaffney that she was experiencing "minimal pain" and had taken only one Percocet since her last visit. (R. at 338)

On April 24, 2006, Demetrio Agcaoili, M.D., performed a followup examination of Plaintiff, reporting that her amputation stumps were healing well but a bluish discoloration was present on

the right plantar foot. (R. at 326) Dr. Agcaoili noted that Plaintiff was not in any form of distress, but Plaintiff reported to Dr. Agcaoili that she experiences pain in her feet "every once in awhile" on a pain scale of two. (R. at 326-27)

On April 25, 2006, Dr. Gaffney performed an examination of Plaintiff, observing that she has healed "remarkably well." (R. at 337) At that time, Plaintiff had no pain, and informed Dr. Gaffney that she had not taken Percocet that week. (R. at 337) On May 10, 2006, Dr. Gaffney reported that Plaintiff removed her Duragesic patch because she was not experiencing any pain; however, she began to have withdrawal symptoms, so the patch was restarted at a reduced dosage. (R. at 336) Plaintiff continued to take Percocet as needed, and reported to Dr. Gaffney that she had pain in her feet on a scale of three. (R. at 336) Plaintiff was assessed as "doing well," and although there was some purplish discoloration of the foot, there was no edema. (R. at 336) On May 12, 2006, Plaintiff was discharged to home on antibiotics, with activity "as tolerated." (R. at 258)

On May 31, 2006, Plaintiff again visited Dr. Gaffney, who noted that Plaintiff sometimes has pain when walking, on a scale of one to three. (R. at 335) Dr. Gaffney noted that the incision areas were well healed, that there was no cellulitis, no edema, no pain on palpation, and that Plaintiff ambulated well in a pair of cross-training Asics tennis shoes. (R. at 335) Plaintiff began wearing diabetic shoes and insoles, but, on August 16, 2006, she informed Dr. Gaffney that the insoles hurt her feet and made her uncomfortable. (R. at 334) Plaintiff also reported taking Vicodin to relieve occasional pain and sensitivity in her toes and the balls of her feet. (R. at 334) On examination, Plaintiff had no pain on palpation or with range of motion of her feet, and normal dorsalis pedis and

posterior tibial pulses. (R. at 334) Her feet were warm and pink, and she ambulated well in her diabetic shoes despite complaining that they were uncomfortable. (R. at 334) Meanwhile, in July 2006, Plaintiff returned to her job as a hospital insurance clerk, working two days and ten hours per week. (R. at 38, 40, 45, 49, 51, 343)

The medical records of Daniel Wilson, M.D., Plaintiff's primary care physician, contain references to leg and foot pain during visits from August 18, 2006, to September 15, 2008. (See R. at 357-80, 403-37) On August 18, 2006, Plaintiff told Dr. Wilson that her feet were feeling better, but she still had pain and was using roughly six Vicodin a day. (R. at 371) Plaintiff reported no pain during a visit on October 9, 2006. (R. at 369) On October 23, 2006, Plaintiff was generally doing well but still had some pain in her feet that "waxed and waned." (R. at 367) On November 3, 2006, Plaintiff visited Dr. Wilson for neck pain, but did not report pain in her legs or feet. (R. at 365) On November 21, 2006, Plaintiff felt okay but still had foot pain, which she described as soreness of a "burning and stinging quality." (R. at 363) On December 28, 2006, Plaintiff reported that she felt okay, had no new problems, and that her foot and leg pain was about the same. (R. at 361) On March 7, 2007, Plaintiff told Dr. Wilson that she still had pain in her feet and she was using roughly three to four Vicodin per day. (R. at 359) On May 1, 2007, Plaintiff was generally doing okay, but still had pain in her toes and feet. (R. at 357) On July 2, 2007, Plaintiff stated to Dr. Wilson that she feels okay and that her pain is about the same, but more activity or time on her feet makes the pain worse. (R. at 436) She described her pain as a burning type discomfort in her foot. (R. at 436) On August 24, 2007, Plaintiff still had foot pain, and was using roughly four Vicodin a day. (R. at

434)  On October 16, 2007, Plaintiff reported intermittent pain in her third toe.  (R. at 432)  On November 19, 2007, Plaintiff did not report any pain.  (R. at 430)

On January 3, 2008, Plaintiff visited Dr. Wilson to discuss a lack of motivation and energy, and neuropathy-type pain in her feet.  (R. at 428)  On January 11, 2008, Plaintiff visited Dr. Wilson for an ache in her lower back; Dr. Wilson's notes make no mention of foot or toe pain, but does state that Cymbalta did not help with the neuropathy pain in her legs.  (R. at 426)  On March 4, 2008, Plaintiff visited Dr. Wilson for foot pain/soreness, reporting pain in both feet.  (R. at 422)  On March 25, 2008, Plaintiff was seen for elevated blood sugar and dizziness; Dr. Wilson made no mention of foot or toe pain at this time, noting only that Plaintiff had leg cramps.  (R. at 420-21)  Plaintiff did not report pain during a routine checkup on April 7, 2008.  (R. at 418)  On May 5, 2008, Plaintiff consulted Dr. Wilson for management of her diabetes; she did not report pain during the visit.  (R. at 416)  On May 19, 2008, Plaintiff was treated for numbness in her left arm and atypical chest pain; however, she did not report any pain or soreness in her legs, feet, or toes.  (R. at 414)  On June 2, 2008, Plaintiff returned to Dr. Wilson to review her medications, at which time she reported that her Neurontin prescription was not helping her diabetic neuropathy pain.  (R. at 412)  On June 20, 2008, Plaintiff was treated for a "little twinge" in her back; at this time, she reported that she still had neuropathic pain in her feet and legs, and was taking Vicodin.  (R. at 410)

On June 6, 2008, Plaintiff visited Dr. Wilson for severe lower back pain that radiated down both legs, which was minimally treated by Vicodin and described as "white poker" pain that caused her to vomit.  (R. at 408)  Dr. Wilson's notes on June 6th make no mention of foot or toe pain.  (See

R. at 408-09)  Plaintiff visited Dr. Wilson on August 12, 2008, for management of her diabetes, reporting no new problems but an increase in her foot pain, which felt different from her neuropathy pain.  (R. at 406)  Dr. Wilson, on September 15, 2008[1] reported that Plaintiff had transient, "prickly" pain in her right leg that was localized to her knee.  (R. at 404)

On January 30, 2007, Plaintiff was examined by Gabriel Sella, M.D., for a disability determination examination.  (R. at 343-48)  Dr. Sella's examination states that Plaintiff was 63 inches tall, weighed 238 pounds, and had a normal range of motion in the shoulders, elbows, wrists, knees, hands, hips, ankles, cervical spine, and lumbar spine.  (R. at 344, 347-48)  She was able to walk "remarkably well" considering her amputations, and did not use a cane.  (R. at 345)  Plaintiff was able to get on and off the examination table without difficulty, and could heel walk, tandem walk, and squat; however, she could not hop or walk on her toes.  (R. at 345)  Plaintiff had increased sensitivity to touch and vibration in the area of the amputations, but her upper and lower extremity strength and straight leg raising were normal, she had no swelling in the feet or legs, and Romberg's balance test was negative.  (R. at 345, 347)  Dr. Sella concluded that Plaintiff had mild peripheral arterial disease, credible pain in the feet, and hyperesthesia.  (R. at 345)  In terms of the constant pain in the food and the legs, Dr. Sella reported that Plaintiff was taking appropriate medication. (R. at 345)  Dr. Sella further determined that Plaintiff was capable of the following work-related functioning:

_____

[1]The date at the top of Dr. Wilson's progress notes for this visit is cut off in the record and illegible.  The date of September 15, 2008, is listed on page 403 of the record as the final, and most recent, treatment date contained in Exhibit 15F.  (R. at 403)

WORK-RELATED FUNCTIONING: The examinee is working ten hours a week in medical billing. She works very little time in standing up such as filing obligations. She can sit. She can occasionally stand. She can occasionally walk. She can occasionally do light lifting and carrying. She can handle objects. She can hear, speak, and shower.

(R. at 345)

On March 12, 2007, Fulvio Franyutti, M.D., a state agency medical consultant, reviewed the evidence in the record as of that date and concluded that Plaintiff possessed the physical residual functional capacity ("RFC") to perform a reduced range of light work. (R. at 349-356) In his report, Dr. Franyutti noted that Plaintiff had no trouble walking, normal straight leg raising and range of motion, and no swelling in the legs or feet. (R. at 354) According to Dr. Franyutti, Plaintiff's allegations of balance problems, amputated toes, circulation problems, constant pain in her foot and legs, and swelling in her legs and feet, appear to be "partially credible." (R. at 354) Ultimately, Dr. Franyutti determined that Plaintiff had the capacity to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push or pull without limitation. (R. at 350)

On June 26, 2007, Joseph A. Shaver, M.D., a state agency psychologist, determined that Plaintiff did not have a severe mental impairment. (R. at 381) Dr. Shaver did, however, diagnose her as having anxiety that did not precisely satisfy the diagnostic criteria for an anxiety-related disorder. (R. at 386)

On July 2, 2007, Cindy Osborne, D.O., a state agency medical consultant, reviewed the medical evidence and concluded that Plaintiff had the RFC to perform light work, with walking and

standing limitations. (R. at 400) Dr. Osborne recommended that Plaintiff limit her walking and standing to 2 hours in an 8-hour work day, and limit the use of her lower extremities for foot controls due to the amputations. (R. at 396) Dr. Osborne further opined that "the evidence of record establishes a basis for a degree of limitation, but it fails to support the disabling degree alleged by the claimant. Therefore, the claimant is felt to be partially credible." (R. at 400)

On November 17, 2008, Dr. Wilson's office completed a physical capacity evaluation form, signed by Certified Family Nurse Practitioner ("CFNP") Peggy Ferguson. (R. at 438-40) The evaluation form indicated that Plaintiff can stand for less than 1 hour in an 8-hour work day, walk for less than 1 hour in an 8-hour work day, sit for less than 1 hour in an 8-hour work day, occasionally lift or carry a maximum of less than 10 pounds, and frequently lift or carry a maximum of less than 10 pounds. (R. at 439-40) The evaluation form consists of a check-the-box evaluation only, and was not accompanied by a narrative report. (See R. at 439-40)

D.    Testimonial Evidence

At the ALJ hearing held on November 20, 2008, Plaintiff testified that she has pain in her legs, regardless of whether she is sitting or standing, and that her legs become cold and molded below her knees if she sits for long periods of time. (R. at 50-51) She testified that, if she works on Monday and Tuesday, she must spend Wednesday laying down with her feet up to "get the swelling down and take the throbbing off." (R. at 51) The swelling in her legs is caused by sitting and walking. (R. at 51-52) She cannot walk barefoot due to pain in her feet, which her doctor told her was caused by her neuropathy. (R. at 52-53) Plaintiff testified that she is taking Coumadin to

prevent blood clots, Actos and Janumet for diabetes, Prevacid for acid reflux, Demadex for fluid retention issues, Celebrex for arthritis in her thumbs, Vicodin and Percocet for pain, Xanax for anxiety, and Flexeril for back problems. (R. at 50, 54, 56, 58-60) Plaintiff has arthritis in her thumbs, but she is able to do keyboarding work so long as she takes Celebrex. (R. at 56) Plaintiff takes three to four Vicodin a day, and maybe one Percocet a day, to help with the pain in her toes. (R. at 58-59) She stated that she could lift a gallon of milk with one hand, she can walk for eight to ten minutes without resting, and that she can only stand still for a few minutes before she starts fidgeting or needs to sit down. (R. at 63-64) If she sits for a long period of time, her legs get a numb feeling and she must stretch them. (R. at 65) She testified that she has pain all the time, and on a normal day her pain is on a scale of one to two, regardless of whether she sits, stands, or lays down. (R. at 65)

Lawrence Ostrowski, an impartial vocational expert, also testified at the hearing on November 20, 2008. (R. at 67-75) Ostrowski characterized Plaintiff's work as sedentary and skilled. (R. at 67, 72-73) In regard to Plaintiff's ability to do her past relevant work, Ostrowski offered the following responses to the ALJ's questions:

> Q.    I want you to assume that the Claimant . . . could lift or carry . . . 50 pounds
>       occasionally, 10 pounds frequently. Would be limited to standing or walking
>       two hours in an eight hour workday. Could sit for six hours in an eight hour
>       workday. Wouldn't be able to use the lower extremities for operations of
>       foot pedals or foot controls I guess, but she is able to drive . . . . [W]ould be
>       limited to only occasionally climbing ramps or stairs . . . [W]ouldn't be able
>       to climb ladders, ropes or scaffolds. Wouldn't be able to do jobs that would
>       require her to balance. Can occasionally stoop, kneel and crouch. . . .
>       [W]ouldn't be able to work for long periods of time in cold temperature
>       extremes. Wouldn't be able to work in atmospheres of high concentrations

of fumes, odors, dust and smoke. Wouldn't be able to work at unprotected heights or work around dangerous moving machinery. Would she be able to do her past relevant work?

A.    Yes, Your Honor.

Q.    All right. I want you to assume that the Claimant would be limited to sedentary work, but would be – due to her impairments . . . off task two hours out of an eight hour workday either because she had to lay down or otherwise couldn't perform her work functions. Would she be able to do her past relevant work?

A.    No, Your Honor.

(R. at 73-74) If Plaintiff were unable to perform her past relevant work, Ostrowski opined as follows:

Q.    Would she be able to do any work at the light or sedentary level if she was off task two hours out of an eight hour workday?

A.    No, Your Honor.

. . .

ALJ:  I want you to assume that the Claimant could stand or walk for two hours in an eight hour workday. Could sit for two hours in an eight hour workday. Would be off task the other four hours. Would there be any full-time unskilled jobs such a hypothetical person could do in the local or national economy with those limitations?

VE:   No, Your Honor, there'd be no jobs.

(R. at 74-75)

E.    <u>Lifestyle Evidence</u>

Plaintiff lives in a single family, ranch-style house, and she must climb three stairs to access the main floor of the home. (R. at 36-37) Although her home also has a basement, most everything

is done on the first floor.  (R. at 36)  She does the housework herself, but does it in "spurts."  (R. at 53)  She does her laundry on the first floor, and also does the vacuuming.  (R. at 37, 60)

Plaintiff does not belong to any civic groups or organizations, but attends church once every six weeks.  (R. at 61)  She testified that, prior to her injury, she attended church every week.  (R. at 61)  She babysits her two-year-old grandson once a month, looking after him for one to two days each visit.  (R. at 61)  Her grandson is very active, but he cooperates with her.  (R. at 61-62)

Plaintiff uses a hot tub for exercise.  (R. at 52)  She testified that swimming does help and that she should do more of it to lose weight, but that it would require her to get back in the car and drive in to town.  (R. at 52)  She also stated that she can only use a pool with steps, and cannot climb a step ladder due to pain in her feet.  (R. at 52)

Plaintiff has a valid motor vehicle license and drives four times a week, traveling alone unless she needs her husband's help at the grocery store.  (R. at 37, 60)  She drives twenty minutes to work two days a week, drives twenty minutes to the grocery store each week, and will occasionally drive to visit her mother.  (R. at 38)  She can no longer operate a standard transmission vehicle, but can drive a car with an automatic transmission.  (R. at 63, 73)

Plaintiff goes grocery shopping at least once a week.  (R. at 60)  She does the grocery shopping herself, but will bring along her husband to load larger items.  (R. at 60)  She typically takes one hour to finish her shopping.  (R. at 60)  She testified that she is able to shop for this length of time by leaning on the shopping cart, but cannot shop for very long if she does not have a cart for support.  (R. at 60, 64)

Plaintiff works ten hours a week as an insurance clerk, answering phones and working on a computer. (R. at 40) Plaintiff testified that, prior to her injury, in an eight hour day she would typically spend half an hour filing and one hour walking around the office, but that she performed most of her job while sitting. (R. at 43) On rare occasions, she would lift items delivered to her office that weighed in excess of 20 pounds. (R. at 43) She has worked as an insurance clerk for 16-17 years. (R at 43) Plaintiff worked part-time for 24 hours a week prior to her injury, and currently works 10 hours per week. (R. at 50) She typically works on Monday and Tuesday of each week. (R. at 51) Plaintiff testified that her employer accommodates her needs, allowing her to take half days, leave for doctor's appointments, or switch the days of her schedule. (R. at 66) She is also allowed to stand up and move around as needed to help with the numbness she feels in her legs. (R. at 65)

In September 2006, Plaintiff took a four day vacation to Amish country. (R. at 62-63)

### III. CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, alleges that the decision of the ALJ is arbitrary, contrary to law, and unsupported by substantial evidence. (See Pl.'s Motion, ECF No. 8) Specifically, Plaintiff argues that the ALJ's determination that she has the residual functioning capacity to perform light work is erroneous because:

1. the ALJ improperly concluded that the Plaintiff's testimony is not credible because his conclusion is based only on the daily activity schedule of the Plaintiff. Plaintiff further argues that testimony about her daily activities is not inconsistent with her allegations of disabling pain, and Plaintiff's testimony alleging disabling pain is consistent with the medical symptoms displayed in the record, the information provided by medical sources, and

Plaintiff's own statements to treating sources (Pl.'s Mot. 8-16); and

2.    the ALJ did not properly weigh the medical evidence in the record because he rejected the opinion of Certified Family Nurse Practitioner ("CFNP") Ferguson and adopted the opinions of the state agency physicians without weighing the evidence according to the factors set out at 20 C.F.R. § 404.1527(d). (Pl.'s Mot. 17)

In response, Defendant argues in his motion for summary judgment that the ALJ's final decision denying Plaintiff's claim for disability insurance benefits is supported by substantial evidence and should be affirmed as a matter of law. (Def.'s Motion, ECF No. 11). Specifically, Defendant argues that:

1.    the ALJ's assessment of Plaintiff's testimony is supported by substantial evidence because the objective medical evidence, the Plaintiff's own testimony as to her daily activities, and the findings of the state agency medical consultants contradict her assertion that she suffers from disabling limitations and pain (Def.'s Mot. 11-14); and

2.    the ALJ properly determined that the report of Ms. Ferguson was not entitled to controlling weight because it was not supported by the weight of medical evidence in the record, was inconsistent with Plaintiff's testimony as to her daily activities, was rendered on a check-the-box type form after only one visit with Plaintiff, and was inconsistent with the findings of the state agency medical consultants. (Def.'s Mot. 14)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. <u>See</u> 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); <u>Richardson v. Perales</u>, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); <u>Coffman v.</u>

Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972).

## V. DISCUSSION

A.  Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
> 20 C.F.R. § 404.1520.]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

B.    The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

> **1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.** (R. at 17)

2.  The claimant has not engaged in substantial gainful activity since January 31, 2006, the alleged onset date (**20 CFR 404.1571** *et seq.*).  (R. at 17)

3.  The claimant has the following severe impairments: diabetes mellitus; status post blood clot with amputation of toes; and obesity (**20 CFR 404.1520(c)**). (R. at 17)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (**20 CFR 404.1525 and 404.1526**).  (R. at 20)

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, lifting and carrying 20 pounds occasionally and ten pounds frequently, as defined in 20 CFR 404.1567(b).  The claimant can stand/walk for two hours in an eight hour workday; sit for six hours in an eight hour workday; occasionally stoop, kneel, crouch, and climb ramps/stairs, but cannot use lower extremities for foot controls.  The claimant cannot balance, crawl, climb ladders/ropes/scaffolds, or be exposed to hazards such as dangerous and moving machinery or unprotected heights.  The claimant must also work in a controlled environment free of long periods in cold temperatures, with no atmosphere of high fumes, odors, dust, and/or smoke.  (R. at 20)

6.  Within 12 months of her alleged onset of disability date the claimant was capable of performing her past relevant work as an Insurance Clerk, Dictionary of Occupational Titles Code No. 214.362-022.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (**20 CFR 404.1565**).  (R. at 22)

7.  The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2006, through the date of this decision (**20 CFR 404.1520(f)**).  (R. at 22)

C.  Substantial Evidence Supports the ALJ's Credibility Determination

As her first assignment of error, Plaintiff argues that the ALJ's credibility determination is

not supported by substantial evidence because it is based only on her daily activity schedule. (Pl.'s Mot. 8, ECF. No. 8) Plaintiff further argues that the record as a whole shows no inconsistency between her allegations of disabling pain and her testimony about her daily schedule. (Id.) In response, Defendant argues that the ALJ's credibility determination is supported by the record because Plaintiff's complaints of disabling pain were inconsistent with the medical records, her own testimony as to her activities and limitations, and the findings of the state agency medical consultants. (Def.'s Mot. 10-13, ECF. No. 11)

The determination of whether a person is disabled by pain or other symptoms is a two step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Id. (quoting 20 C.F.R. §§ 416.929(b), 404.1529(b)). Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. See id. at 595. Social Security Ruling 96-7p sets out detailed guidelines for assessing the credibility of an individual's subjective allegations of pain, listing the following factors to be considered in making a credibility determination:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight.  Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).  However, the ALJ's determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374,186, at *2.

Neither Plaintiff nor Defendant dispute the ALJ's determination that "[t]he amputation of the claimant's toes, diet controlled diabetes mellitus, and obesity could reasonably be expected to produce some of the pain and symptoms alleged by the claimant."  (R. at 21)  Because the objective medical evidence in the record indicates that Plaintiff does in fact suffer from these conditions, it was proper for the ALJ to assess the credibility of Plaintiff's testimony about her symptoms.  See Craig, 76 F.3d 585.  In making his credibility determination, the ALJ's opinion included evidence that  pertains to six of the seven factors listed in SSR 96-7p.  First, the ALJ specifically examined Plaintiff's daily activities:

At the hearing the claimant testified that she has a driver's license and drives about

four times a week. She is able to travel alone. She goes to work two days a week, goes to the store, and goes to her mothers. The claimant reported that she works about ten hours a week and that she returned to work in July 2006. Prior to her illness she worked 24 hours a week. Her job is working with insurances, using computers, and answering the telephone. She described her job as mostly sitting. The claimant testified that she does her housework in spurts. She grocery shops one time a week. She vacuums. She goes to church one time every six months. She baby sits her grandson once a month.

(R. at 21) Second, the ALJ's opinion contains multiple references to the location, duration, frequency, and intensity of Plaintiff's pain and symptoms as reported by Plaintiff to her treating physicians:

- Physical therapy progress note states that the claimant bears weight on her right foot against doctors' orders and states that she feels better walking on it rather than hopping. (R. at 18)

- Record notes that the claimant had less pain throughout her hospital course, and some narcotic pain medications were weaned. (R. at 18)

- [T]he claimant stated that she was not having any pain so she thought she could take [her pain patch] off. Withdrawal symptoms started and the claimant was put back on the pain patch. (R. at 18)

- The claimant further reported that her toes were "occasionally" painful and sensitive . . . . (R. at 19)

- On May 1, 2007, the claimant reported to Daniel Wilson, M.D., her primary care provider, that she was generally doing "OK" but still had pain in her toes and feet. (R. at 19)

- July 2, 2007, claimant reported to Dr. Wilson that she felt okay and her pain was about the same, a burning type discomfort in her forefeet. (R. at 19)

- Dr. Wilson reported on October 16, 2007, that the claimant had complaints of left foot, third digit pain only. The claimant also had complaints of gastroesophageal reflux symptoms. (R. at 19)

- [On March 17, 2008] The claimant reported "leg cramps." (R. at 20)

- June 2, 2008, Dr. Wilson reported the claimant's sugar down, at 160-179, weight loss down to 242 ½, and no complaints of pain. (R. at 20)

- [Plaintiff testified that] when she sits her legs get numb and cold and she has to get up and walk around. (R. at 21)

Third, the ALJ's opinion takes note of factors identified by the Plaintiff which aggravate her condition:

- On August 16, 2006, Dr. Gaffney reported that the claimant had diabetic shoes and insoles but that the insoles hurt her feet and made her uncomfortable. (R. at 19)
- Dr. Sella noted that the claimant has hyperthesia to touch and to vibration in the amputation areas. (R. at 19)

- The claimant reported that increased activity, or time on her feet made her worse. (R. at 19)

Fourth, several references are made to the type, dosage, effectiveness, and side effects of any medication Plaintiff takes or has taken to alleviate pain or other symptoms:

- The claimant further reported [on August 16, 2006] . . . that she was still taking Vicodin on occasion. (R. at 19)

- The claimant [on May 1, 2007] requested a refill on Vicodin. (R. at 19)

- Dr. Wilson stated that the claimant was weaning herself off of Neurontin which had been prescribed for neuropathy. (R. at 20)

- [Plaintiff] reported on her disability report that she was prescribed Xanax by her primary care provider, Dr. Wilson, for sleep and anxiety. (R. at 20)

- On January 11, 2008, Progress note from Dr. Wilson's office reports that the claimant stopped Cymbalta on "Tuesday" due to side affects, and that she was "much better" since stopping Cymbalta. (R. at 20)

Fifth, the ALJ noted the treatment, other than medication, that Plaintiff has received for relief of pain or other symptoms, which consisted of occupational and physical therapy during her stay at Reynolds Memorial Hospital, and instructions for an 1800 calorie a day diet. (R. at 18) Sixth, the ALJ mentioned that Plaintiff exercises in her hot tub and does some swimming as other methods of controlling her weight and alleviating pain. (R. at 21)

Based on the above information, the ALJ concluded that Plaintiff "engages in significant daily activities." (R. at 21) Furthermore, while the ALJ noted that Dr. Wilson's records do contain evidence of some pain and edema, he ultimately concluded that "the claimant's pain is controlled by medications and there are not a lot of pain complaints in the treating records." (R. at 22) This conclusion is supported by the Plaintiff's own testimony; at the hearing, Plaintiff stated that on a normal day her pain is on a scale of one to two, and that she takes Vicodin and Percocet for the pain in her toes. (R. at 58-59, 65) Because the ALJ's credibility conclusion is adequately supported by the treatment records of Dr. Wilson, the findings of the State Agency physician, the findings of the consultative physical evaluation, and Plaintiff's own testimony about her daily activities and pain levels, the undersigned Magistrate Judge finds that substantial evidence supports the ALJ's credibility conclusion.

D.      Substantial Evidence Supports the ALJ's decision to reject CFNP Ferguson's Evaluation

As her second assignment of error, Plaintiff argues that the ALJ erred in rejecting the opinion of CFNP Ferguson and adopting the opinions of the state agency physicians because he did not weigh the conflicting opinions according to the factors set out in 20 C.F.R. § 404.1527(d). (Pl.'s

Mot. 17, ECF No. 8)  In response, Defendant contends that the ALJ properly rejected the report of CFNP Ferguson because it was not supported by the weight of medical evidence in the record, was inconsistent with Plaintiff's testimony as to her daily activities, was rendered on a check-the-box type form after only one visit with Plaintiff, and was inconsistent with the findings of the state agency medical consultants.  (Def.'s Mot. 14, ECF No. 11)

      As an initial matter, it is important to point out that CFNP Ferguson's report does not qualify as a medical opinion and is not entitled to controlling weight because she is not a physician, psychologist, or other "acceptable medical source."  See 20 C.F.R. § 404.1527(2).  Under current regulations, "acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  SSR 06-03p, 2006 WL 2329939, at *1 (August 09, 2006).  Nurse Practitioners, such as CFNP Ferguson, are expressly included in the regulations as "other sources."  See id. at *2 (citing 20 C.F.R. §§ 404.1513(d) and 416.913(d)).  "Other sources" cannot establish the existence of a medically determinable impairment, cannot give medical opinions, and cannot be considered treating sources whose opinions may be entitled to controlling weight.  Id.  Thus, CFNP Ferguson's report was not entitled to analysis under the factors set forth under 20 C.F.R. § 404.1527(d) and cannot be assigned controlling weight because it simply was not a medical opinion.

      Even though CFNP Ferguson's report is not a medical opinion from an acceptable medical source, the regulations require the ALJ to consider all relevant evidence in the case, including evidence from medical sources who are not acceptable medical sources.  Id. at *4.  Although the

factors outlined in 20 C.F.R § 404.1527(d) "explicitly apply only to the evaluation of medical opinions from acceptable medical sources, these same factors **can be applied** to opinion evidence from other sources." Id. (emphasis added). However, SSR 06-03p makes clear that "[n]ot every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an acceptable medical source depends on the particular facts in each case." Id. at *5.

In evaluating a medical opinion from a source who is not an acceptable medical source, the ALJ may, in certain circumstances, assign the evidence greater weight than conflicting opinion evidence from an acceptable medical source:

> [f]or example, it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

Id. at *5. However, if the ALJ declines to give more weight to the opinion evidence of a source who is not an acceptable medical source, the ALJ's opinion need not fully explain his findings under each factor. Because "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision," the case record need only reflect that an opinion from an "other source" was considered, and provide a general explanation of the weight given to the opinion so that a reviewer may follow the adjudicator's reasoning. Id. at *6.

In this case, it is clear that the ALJ not only considered the opinion offered by CFNP Ferguson, but gave specific reasons for why that opinion was not entitled to greater weight than the

opinions of the state agency physicians. The ALJ made the following observations in regard to the opinion tendered by CFNP Ferguson:

> The undersigned agrees that the claimant could not climb ladders or operate foot controls (Exhibit 16F). However, the rest of the opinion is not supported by the medical evidence of record, including Dr. Wilson's treatment records. The undersigned finds that the opinion is inconsistent with Dr. Wilson's treating notes and in fact inconsistent with the claimant's own testimony regarding her ability to do things including work part time. The undersigned also notes that the claimant testified that she had only seen Dr. Wilson's nurse (CFRP [sic] Ferguson) on [sic] time and usually sees Dr. Wilson every two months. . . . The undersigned has considered, but does not find CFNP Ferguson's opinion entitled to controlling weight.

(R. at 22) Additionally, as noted by Defendant, CFNP Ferguson's evaluation form consists of a check-the-box evaluation only, and is not accompanied by a narrative report. (See R. at 439-40) CFNP Ferguson's evaluation, which was rendered after examining Plaintiff only once and contains no supporting evidence or explanation, differs markedly from the hypothetical provided in SSR 06-03p and discussed above. See SSR 06-03p, 2006 WL 2329939, at *5. Because the ALJ clearly stated that he had considered the evidence presented by CFNP Ferguson and gave specific reasons for not assigning that evidence controlling weight, the undersigned Magistrate Judge finds that the ALJ's decision is supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits. Accordingly, I recommend that Plaintiff's Motion of Summary Judgment (ECF No. 8) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 11) be **GRANTED**, and the Decision of the

Administrative Law Judge be **AFFIRMED** because:

1.      Substantial evidence supports the ALJ's determination that Plaintiff's subjective allegations of disabling pain were not credible; and

2.      The ALJ properly considered the evidence submitted by CFNP Ferguson, and substantial evidence supports his decision to assign more weight to the medical opinion of the state agency physician and the consultative physical evaluation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert.</u> <u>denied</u>, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **10th** day of **September**, **2010**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE